I'm ready to proceed? Very good. Good morning, Your Honors, and may it please the Court. My name is Ron Yankich, and I appear on behalf of Douglas Nielsen, who appeals his conviction for possession of controlled substance in the court below. We raise three issues on appeal, and consistent with the Court's order, I would like to focus on what I believe to be the differences in those three issues that we've raised between counsel and myself in both the briefs and the reply briefs. The first issue is actually the second issue that is argued in our briefs, and that relates to an issue of the admissibility of hearsay testimony during the course of the trial. During the course of the trial, the defendant himself did not testify. The defendant put the government to their proof in this case relative to one important issue, and that was whether or not drugs that were found in a safe at what was concededly his home and the home of a young lady by the name of Mrs. Volz, Ms. Volz, who was his girlfriend, were his drugs or the drugs of Ms. Volz. That was the entirety of the issue that was argued during the course of the jury trial before the district court below. During the course of that questioning, the officer in this particular case, the assistant United States attorney, asked the officer several questions about ownership of the drugs and control of the drugs. Specifically, he asked, and Ms. Volz said she had no access to the safe. Now, Ms. Volz did not testify. She was not a participant during the course of the trial. And the agent asked what she said. The officer answered, that's correct, she did not have access to the room. Did she indicate that anybody did have access? The answer was the defendant at the time that an objection was made. The objection was overruled, and the court allowed this to come in as substantive evidence of the defendant's possession of the contents of that particular safe. Other evidence was offered, as is argued in the brief of the appellee, but we suggest to the court that based on this court's opinions in prior cases, United States v. Calcutt particularly, and United States v. Dean, this type of hearsay, unconfrontable hearsay, goes to the very heart of the matter before the court, and this court should reverse this conviction on that basis alone. Let's assume, hypothetically, we agree with you that there's a violation. Next question is, was it harmless error, right? And our position, Judge Tashima, is very simple in that regard. If this was just a tangential statement relative to who the owner of the house was, we would probably be on less firm ground relative to harmless error. But this case – but this elicited statement went directly to who had control of the safe, not just who had access to it, but basically who had dominion and control over the safe at the time. We learned later during the course of the trial on cross-examination that Ms. Folcher herself was a drug dealer to undermine the government's theory that only Mr. Nielsen would have access or reason to deal drugs. But to go back to the specific point, this court in Colcutt has indicated – and in that case, that case was a very interesting case where there were major amounts of drugs as well as paraphernalia. The trial court had erroneously admitted hearsay testimony of a declarant who purportedly saw the defendant purchase drugs. There was overwhelming evidence in some people's mind of the appellant in that case's guilt. And notwithstanding the fact that the defendant in that case was actually found in possession of the drugs – he was there when the drugs were found – this court remanded, reversed and remanded, and reasoned. The government's overkill went to the very heart of the case. Consequently, we cannot conclude that error was more likely than not harmless. Accordingly, we must reverse. What evidence is there that you would point to or that you believe suggests that somebody else had dominion and control over the state? Because she was a drug dealer doesn't necessarily mean that she had control. I agree with you on that, Judge Breyer. What would you take a look at? I would ask the Court to take a look at who was in the house when the search warrant was executed. It wasn't Mr. Nielsen. It was Ms. Volz. She was actually in possession of the house, effectively, which included that she was there. Was there evidence indicating that she lived there, resided there? Yes, there was evidence that was offered. My recollection is that there was no contest to the fact that she not only lived there, that she was the defendant's girlfriend and had resided there for a period of time. Did the defendant know that the defendant sold drugs at the house? There was testimony from the individual who was the primary informant in the search warrant that the defendant had sold her drugs and she had observed drugs there, I believe, on December 31st. I think the search warrant was executed on January 7th, but about eight days before it. That's correct, Your Honor. But the evidence – That's not the only one. I'm sorry? That's not the only one. That was Fritzford. That's correct. What about Crider? Crider's information, Judge, was that he had purchased drugs from the defendant a substantial period of time before. One of the arguments that we made on the search warrant to kind of bring these two issues together was that that evidence was somewhat stale. I think Crider's – Crider said that Nielsen had retrieved the methamphetamine from the basement. And that was in – And that Nielsen repeatedly bragged about having large quantities of methamphetamine at his residence. I believe that's true. And I think, however, that that relates back – and I'm always willing to be wrong, but I don't think I'm wrong on this one, Your Honor. That relates back to about two years before that time. What we argued in this case and what we argued before this Court is the issue in this case wasn't whether he had been a drug dealer in the past or even whether or not Ms. Volz was a drug dealer in the past. The issue was whether or not at the time that the search warrant was executed, with Volz being the only individual in that house, that the defendant had dominion and control. And by the – and the State or the government offered evidence through testimony of other individuals that he had dealt with, and that was fair 404b2 evidence. So I concede that. So you point to the evidence that she was present at the time the warrant was executed? That's correct. His girlfriend. Evidence that she was his girlfriend? Yes. And there was a – And what is the evidence that you point to that substantiates your position that she resided there? Who testified to that? The officer. Clothes found there, mail, you know. Your Honor, I have to be completely candid. I don't recall because I don't believe that it was ever contested by the government that she lived there. I'll ask the government. The fact of the matter is, is it was pretty much conceded since she was there when the search occurred. She did not testify. She could be present at the time the search – you know, the warrant is executed and the search is carried out, but that doesn't necessarily mean that she lived there. No question about it. This Court has ruled on numerous occasions that the mere presence at the scene where drugs are found is not sufficient upon which one can necessarily impute dominion and control. On the other hand – Was there any evidence that she was selling drugs from the residence? There was evidence that she had sold drugs in the past. There was no direct evidence that she had sold drugs from that particular residence in the past. Which is one of the reasons that we believe in this case the hearsay testimony was not only not necessary in this case, but it directed the jury in an unfair way to focus on the defendant relative to that. And interestingly in that regard, Your Honor, later on during the course of the trial, with due respect to my brother at the bar below, the U.S. attorney tried to get hearsay about that very issue again. In that instance, the judge sustained the objection. We think that this Court has put down a very firm rule relative to this type of information. And that is – and I use the phrase once again in Shilcott – this type of unconfrontable overkill in these type of cases in effect directs the jury in an unfair way to the defendant in a way that he cannot deal with it sufficiently during the course of a trial. And the determinative result of that should be that the conviction is reversed and remanded for new trial. I have one minute left and I'd like to reserve that if I may. We'll hear from the government. Thank you, Your Honor. Good morning. I'm Demetra Lambros. Could you keep your voice up? My name is Demetra Lambros. I'm here for the government. We agree that this statement by Nielsen's girlfriend was impermissible hearsay. But its admission was clearly harmless in this case, given the other overwhelming evidence that Nielsen had control over those drugs in the safe, that those drugs that were seized were his. Katherine Fritzler was caught red-handed with half a gram of this stuff, ice. She said that she bought it from Nielsen just a few days before, after they'd smoked it together down in his basement. And she also described a big bag of the stuff that he had with him when they were there together. When at trial, she's on the stand, the government shows her, here's the seized drugs that came out of the safe. She says, yeah, that looks like the stuff that I saw that morning. Both of the officers and the chemists also compared these two drugs. They did a visual comparison of Nielsen's, Fritzler's drugs and the drugs that came out of the safe. It was this unique kind of methamphetamine called ice, these glass shards, people describe it. And they matched. Both of them were that kind of drug. There's also other evidence, as Your Honor pointed out, that ties Nielsen to the drugs that were seized from that safe. It was Nielsen, not the girlfriend, who supplied Catherine Fritzler and Ken Kreider with the drugs over the years, with methamphetamine. Voltz had evidently provided drugs to some hash to Kreider, but there was no doubt that the methamphetamine was all coming from Nielsen, not his girlfriend. Also, it was Nielsen who owned the house. It was Nielsen who didn't have a job and who had lots of cash in his bank accounts, that the police officer believed were proceeds of drugs, $7,000 in the safe. And it was also Nielsen, not his girlfriend, who fled the scene and who evaded the police after those drugs were found. It's also important to note the government never argued this hearsay statement in its closing argument before the jury. It never made its case for Nielsen having possession of those drugs based on that hearsay statement. So it just wasn't something that was before the jury when they were considering the case. And given the evidence as a whole, this one hearsay statement came in very briefly, no comment on it by the court, the defense counsel or the government, harmless beyond a reasonable doubt. The government sort of conceded that she lived there, resided there? The government, as I recall, does not concede that she lived there, but there was evidence that she was there at the time, clearly. And Catherine Fritzler, as I understand, testified that she saw Roxanne Volz there a number of times when she had been there also. So although there was no formal concession that she actually lived at the house, she was present. And Ken Crider and Fritzler had said that they had seen her there at the time. But there was no testimony that she ever sold any methamphetamine to any of these guys. She was not the – he was the meth dealer, not her. There's some evidence that she sold hashish. There was. There was. But what we're talking about here is, you know, 730 grams of ice, and there was no evidence that she had anything to do with any of that. He was the meth dealer, not her. Unless there are any other questions on the other issues? Thank you very much. Thank you. All right. Thank you very much. Your Honor, I think that we've covered those issues, and given the Court's questions of us, I have nothing further to add. All right. Thank you. There are no questions. Thank you very much. We thank both counsel. This case is now submitted for decision. The next case on the argument calendar is Nass State v. Garcia Gomez. Go ahead, please. Good morning, Your Honor. May it please the Court. My name is Amanda Beer, and I'm the attorney for Mr. Angel Gomez-Garcia, the appellant. Mr. Gomez-Garcia has appealed the decision of the trial court,
judges: Tashima, Paez, Bea